FILED

November 25 2014

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 13-0242

DA 13-0242

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 312

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

DANIEL EUGENE GARNER,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DC 09-158
Honorable James A. Haynes, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Wade Zolynski, Chief Appellate Defender, Kristen L. Larson, Assistant
Appellate Defender, Helena, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Tammy A. Hinderman,
Assistant Attorney General, Helena, Montana

          William Fulbright, Ravalli County Attorney, Hamilton, Montana

Submitted on Briefs:  October 8, 2014
Decided:  November 25, 2014

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Daniel Eugene Garner appeals from an order of the Twenty-First Judicial District Court, Ravalli County, denying his motion to withdraw guilty plea. We affirm.

¶2 The following issues are presented for review:

1. *Whether Garner's motion to withdraw plea was time-barred.*

2. *Whether the District Court erred when it concluded Garner's guilty plea was voluntary, knowing, and intelligent.*

**BACKGROUND**

¶3 Garner is a developmentally disabled 40-year-old man. In the summer of 2009, Garner lived in a trailer at the Bitterroot Family Campground near Hamilton. He sometimes babysat four-year-old A.D., whose grandmother also lived in the campground. In October 2009, A.D. disclosed to his mother that Garner had put his mouth on A.D.'s penis. During a forensic interview the following month, A.D. used dolls to demonstrate that Garner had touched A.D.'s penis with his hand, put his mouth on A.D.'s penis, placed his penis in A.D.'s mouth, and inserted his penis into A.D.'s rectum or buttocks.

¶4 On November 19, 2009, Detective Jesse Jessop of the Ravalli County Sheriff's Office interviewed Garner. Garner said he remembered spending time with A.D. the previous summer. Garner initially denied the allegations of sexual conduct, saying he could not remember because of his "brain problems." As the interview progressed, Detective Jessop asked Garner if he had touched A.D.'s penis with his hand. Garner nodded his head, indicating an affirmative response. A few minutes later, Detective

2

Jessop repeated the question. Garner again nodded his head. Garner continued to deny the allegations of oral and anal intercourse.

¶5 On December 4, 2009, Garner was charged with three counts of felony sexual intercourse without consent, in violation of § 45-5-503(1), (4), MCA (2007).[1] His initial appearance was set for December 10, 2009. Garner was represented at that appearance by Nick Miller. Miller advised the court of Garner's possible disability, and requested a continuance of the initial appearance to allow an evaluation of his fitness to proceed. At the continued initial appearance on December 22, 2009, Garner was represented by David Stenerson. Stenerson informed the court that a full evaluation had not yet been completed, but that Garner appeared to have "an obvious difficulty with reading and retention and understanding difficult tasks . . . ." Defense counsel retained a psychiatrist to perform a "full-blown evaluation" to address "overall mental disease and defect." Dr. Paul Moomaw evaluated Garner and determined that he was fit to proceed to trial, although he scored "very low" on language intelligence testing. Dr. Moomaw did not issue a written report, but informed defense counsel of his findings.

¶6 At Garner's arraignment on February 11, 2010, Stenerson advised the District Court that Dr. Moomaw had "come to the conclusion that [Garner] can proceed with trial, and we'll withdraw any objection to that at this point." Garner initialed and signed an acknowledgement of rights form. The District Court asked Garner if he had any concerns about his ability to proceed, and Garner said he did not. Garner also said he understood

___

[1] We apply the 2007 version of the Montana Code Annotated, which was in effect at the time of Garner's offense. Subsequent references are to that version unless otherwise noted.

his rights, felt comfortable asking questions of his attorney, and understood the arraignment proceeding. Garner was informed that he was charged with three counts of sexual intercourse without consent, each of which was punishable by a term of 100 years. Garner pled not guilty to each count and said he understood the maximum punishment.

¶7 On June 15, 2010, the State filed an amended information adding a charge of felony sexual assault, in violation of § 45-5-502(1), (3), MCA. On June 18, 2010, Garner was informed that if convicted of that charge, he could receive life imprisonment or a prison sentence of not less than four years or more than 100 years. Garner said he understood the charge and the maximum possible punishment. He pled not guilty to the charge of sexual assault.

¶8 A jury trial began on September 7, 2010. Stenerson and Miller represented Garner during the trial. On the third day of trial, Garner agreed to plead guilty to sexual assault under § 45-5-502(1), (3), MCA, in exchange for which the State agreed to dismiss the three counts of sexual intercourse without consent. Garner signed a plea agreement, guilty plea, and waiver of rights. The agreement was an "open plea," meaning that the State did not agree to make any particular sentencing recommendation and remained free to argue for the maximum possible sentence.

¶9 The plea agreement, guilty plea, and waiver of rights were submitted to the District Court. The District Court questioned Garner extensively to determine his understanding of the proceedings. Garner said he had understood most of the trial so far, and had been able to rely on his attorneys to explain things to him. He said he felt comfortable asking his attorneys for an explanation if he had difficulty understanding

4

anything about the change of plea process. The District Court asked Garner if he wanted to speak to his attorney before proceeding, and Garner said he did not.

¶10 The District Court then explained the charge of sexual assault and the possible penalty of not less than four years or more than 100 years. Garner said he understood the maximum possible penalty. The District Court asked Garner if he was entering his plea voluntarily, and Garner said yes. The District Court asked Garner if he believed the plea was in his best interests, and he said yes. Garner said he had been given sufficient time to review his rights with his attorneys, and had no questions about them. He agreed he had full knowledge of the rights he was waiving. He said he was satisfied with the services of his attorneys.

¶11 Stenerson then questioned Garner about the factual basis for the plea. Garner said he touched A.D.'s penis with his hand during the summer of 2009, when A.D. was four years old. The District Court then additionally advised Garner that because the victim was under 16 years of age, Garner would be required to serve at least 30 days in jail. The State then recited the terms of the plea, including Garner's understanding and agreement that he could not withdraw his plea once entered. The District Court accepted the plea, ordered a psychosexual evaluation, and dismissed the three counts of sexual intercourse without consent. The jury was excused.

¶12 Dr. Robert Page conducted the psychosexual evaluation. Dr. Page observed that Garner presented with some cognitive delays which may affect his comprehension, and therefore recommended a full neuropsychological evaluation. Dr. Page concluded that Garner was dependent on others and tended to seek reassurance. During the evaluation,

5

Garner was able to describe the allegations against him. He understood that as part of his plea agreement, if he admitted to sexual assault, the State would dismiss the other charges. Garner could not tell Dr. Page the potential sentence for sexual assault, and said he wanted to go home to care for his cats. Garner was aware Dr. Moomaw had evaluated him and found him fit for trial, and Garner said he felt "somewhat capable."

¶13 A neuropsychological evaluation was performed by Dr. Paul Bach. Dr. Bach concluded that Garner's cognitive abilities were in the low-average range. He concluded Garner was not mentally retarded, although he was functioning at a "borderline abnormal level." Dr. Bach observed that Garner was competent with hands-on tasks and capable of learning, but at a disadvantage when required to "mentally conceptualize with language." Dr. Bach concluded that Garner read at a seventh-grade level, which was a fair indication of his cognitive level in most life situations. Dr. Bach described Garner as an "extraordinarily simple, unbright individual who is significantly depressed and anxious at this time."

¶14 A sentencing hearing was held on March 22, 2011. During the hearing, Stenerson objected to the State's presentation of evidence, arguing that it amounted to "retrying this case; and if that is the case, I think I need to ask to withdraw the guilty plea and go to trial." The District Court admitted the disputed exhibits, but declined to consider withdrawal of the plea absent a written motion. Stenerson requested a continuance to consider whether to file a motion to withdraw plea. Stenerson later advised the court administrator that he would not move to withdraw. The sentencing hearing resumed on April 6, 2011. At that hearing, Stenerson informed the court that, despite his earlier

6

representation to the court administrator, after further conversations with Garner, he did not believe Garner knew what he was doing when he entered the guilty plea. Stenerson said Garner would "say almost anything you ask him to say if you ask him a question in the right way." Stenerson asked the court for permission to withdraw the guilty plea. The District Court responded, again, that it would not rule on the request without a written motion and a hearing. Stenerson agreed to proceed with sentencing and file a written motion to withdraw Garner's plea at a later date. The State recommended a sentence of 40 years with 20 years suspended. Stenerson asked the District Court to impose a 10-year commitment to the Department of Corrections, with all time suspended. Stenerson acknowledged the four-year mandatory minimum, but asked the District Court for an exception based on Garner's cognitive disabilities.

¶15 The District Court sentenced Garner to 40 years at the Montana State Prison, with 20 of those years suspended. Garner was required to complete Phases 1 and 2 of the sexual offender treatment program before being considered eligible for parole. The written judgment, issued April 27, 2011, incorrectly stated that Garner would be committed to the Department of Corrections, rather than the Montana State Prison, and did not include the parole restriction. On the State's motion, an amended judgment reflecting these conditions was issued July 12, 2011.

¶16 On July 9, 2012, nearly one year after the issuance of the amended judgment, Garner, represented by new counsel, moved to withdraw his guilty plea. The State opposed Garner's motion, arguing that the motion was untimely and that Garner's plea had been entered voluntarily. An evidentiary hearing was held September 5, 2012.

7

Garner did not challenge the adequacy of the plea colloquy or the finding that he was competent to stand trial, and stated that the only issue was whether the plea was knowing, intelligent, and voluntary. Garner's trial attorneys, Miller and Stenerson, testified at the hearing.

¶17 Miller testified that during his conversations with Garner, it was "very questionable what [Garner] understood about . . . the full consequences of what would happen." Miller said Garner's understanding of the legal process "seemed a little tenuous." Miller acknowledged that during the trial, he had only "small, casual conversations" with Garner. He said he was aware that Garner had been found fit to proceed, and that he had not raised any concerns about Garner's ability to enter a voluntary plea either with Stenerson or before the court. Miller also acknowledged that Garner received a benefit from the plea agreement. Miller said he believed there was a significant difference between fitness to proceed and the ability to enter a knowing, intelligent, and voluntary guilty plea. When asked by the District Court, however, Miller said he was expressing his own opinion and knew of no legal authority supporting a distinction between fitness to proceed and the ability to enter a plea.

¶18 Stenerson testified that after his initial meetings with Garner, it was obvious that he "was functioning at a lower level." Stenerson ordered the fitness to proceed evaluation and withdrew any question about fitness to proceed after learning the results. Despite this, Stenerson said he continued to have personal doubts. Notwithstanding those doubts, Stenerson said he informed the District Court at the change of plea that he did not have any reservations about Garner's ability to enter a knowing, intelligent, and voluntary

8

plea. When asked if that was correct at the time, Stenerson replied, "Legally, yes. In my heart, no." Stenerson acknowledged, "The doctor said he was fit to proceed, and that's a legal issue, and there was no argument about that from me." He described a "gut feeling" that Garner did not fully understand the proceedings.

¶19 Garner testified at the evidentiary hearing and said he remembered some of his conversations with Stenerson about what would happen if he lost at trial. He remembered the judge asking him questions at the change of plea, and said he thought he understood the questions, but was a little confused. He understood that by entering a plea agreement, he would not go to trial and would not be able to call witnesses in his defense. He said he thought he was going to go home and be on probation after entering a plea, because Stenerson "did a note thing on recommended, like for me to go home and be on like a probation for like 10 years." Garner said he did not understand a mandatory minimum sentence. He said he did understand when Stenerson explained to him that if he lost at trial, he could be sentenced to life in prison or 100 years, which he said was "a long time. That's definitely life." He said that when he heard he had been sentenced to a commitment of 40 years with 20 years suspended, he thought, "Man, that's 60 years." He later understood that was not the case, saying, "Dave Stenerson explained that stuff to me. And I was like, Man, well, it's still pretty bad." Garner was also able to name the medications he was taking, describe their purposes and how long he had been taking them, and to clarify for the court that "buspirone" was the generic equivalent of the drug BuSpar.

9

¶20 The District Court found Garner's motion timely because it was brought within one year of the date of the amended judgment. The District Court refused to allow Garner to withdraw his guilty plea, however, finding it had been entered knowingly, intelligently, and voluntarily. The District Court considered the adequacy of the plea colloquy, the benefit Garner obtained as a result of the plea agreement, the fitness to proceed evaluation by Dr. Moomaw, the evaluations by Drs. Page and Bach, and Garner's own testimony and demeanor at the evidentiary hearing. The District Court also made note of an observation in the pre-sentence investigation report to the effect that Garner "has learned to use his mental impairment to serve his interests," and seemed capable of remembering more than he admitted. The District Court found "nothing to suggest any infirmity in Garner's plea process." This appeal followed.

## STANDARDS OF REVIEW

¶21 We review findings of fact for clear error and conclusions of law for correctness. *State v. Warclub*, 2005 MT 149, ¶ 24, 327 Mont. 352, 114 P.3d 254. The ultimate issue of the voluntariness of a guilty plea is a mixed question of law and fact, which we review de novo. *Warclub*, ¶ 24.

## DISCUSSION

¶22 *1. Whether Garner's motion to withdraw plea was time-barred.*

¶23 As a threshold matter, we address the State's argument that Garner's motion to withdraw plea was barred by § 46-16-105(2), MCA, which allows a plea to be withdrawn within one year after judgment becomes final. A judgment becomes final when the time for appeal to this Court expires. Section 46-16-105(2)(a), MCA. In a criminal case, an

10

appeal must be taken within 60 days of entry of the final judgment. M. R. App. P. 4(5)(b). The original written judgment was entered on April 27, 2011. Thus, the State argues, Garner's motion was time-barred as of June 27, 2012.

¶24 We agree with the District Court that the amended judgment, issued July 12, 2011, was the final judgment in this case. *See State v. Ringewold*, 2001 MT 185, ¶¶ 15-16, 306 Mont. 229, 32 P.3d 729 (considering timely appeal from amended judgment issued in 1999, although original judgment had been issued in 1995 and amended judgment was specifically made effective as of the 1995 date); *McKinster v. Great N. Ry.*, 67 Mont. 134, 136, 218 P. 87, 87-88 (1923) (rejecting argument that appeal from amended judgment, taken only two days after entry, was untimely because the time for appeal from the original judgment had expired). Garner's motion to withdraw plea, filed July 9, 2012, was therefore within the period contemplated by § 46-16-105(2), MCA.

¶25　*2. Whether the District Court erred when it concluded Garner's guilty plea was voluntary, knowing, and intelligent.*

¶26 A guilty plea is a waiver of constitutional rights, and must be a voluntary, knowing, and intelligent act. *Brady v. United States*, 397 U.S. 742, 748, 90 S. Ct. 1463, 1469 (1970). "The voluntariness of a plea 'can be determined only by considering all of the relevant circumstances surrounding it.'" *State v. Humphrey*, 2008 MT 328, ¶ 15, 346 Mont. 150, 194 P.3d 643 (quoting *Brady*, 397 U.S. at 749, 90 S. Ct. at 1469). A court may allow a guilty plea to be withdrawn "for good cause shown." Section 46-16-105(2), MCA. Good cause includes the involuntariness of the plea. *Warclub*, ¶ 16. In determining whether a plea was entered voluntarily, we examine "case-specific

11

considerations" including the adequacy of the plea colloquy, the benefit the defendant obtained from the plea agreement, and the timing of the motion to withdraw. *State v. McFarlane*, 2008 MT 18, ¶ 17, 341 Mont. 166, 176 P.3d 1057; *State v. Muhammad*, 2005 MT 234, ¶ 14, 328 Mont. 397, 121 P.3d 521. If the defendant was aware of the consequences of the plea, and if the plea was not induced by threats, misrepresentation, or improper promises, we will not overturn a district court's denial of a motion to withdraw plea. *Warclub*, ¶ 32 (citing *Brady*, 397 U.S. at 755, 90 S. Ct. at 1472).

¶27 A defendant must be mentally competent to enter a guilty plea, just as he must be competent to stand trial. *State v. Lone Elk*, 2005 MT 56, ¶ 21, 326 Mont. 214, 108 P.3d 500 (citing *Godinez v. Moran*, 509 U.S. 389, 398-99, 113 S. Ct. 2680, 2686 (1993)), *overruled in part on other grounds by State v. Brinson*, 2009 MT 200, ¶ 9, 351 Mont. 136, 210 P.3d 164. A defendant is competent when he is able "'to consult with his lawyer with a reasonable degree of rational understanding'" and "'has a rational as well as factual understanding of the proceedings against him.'" *State v. Garner*, 2001 MT 222, ¶ 21, 306 Mont. 462, 36 P.3d 346 (quoting *Dusky v. United States*, 362 U.S. 402, 402, 80 S. Ct. 788, 789 (1960)).

¶28 Garner does not challenge the finding that he was competent under this standard to enter a guilty plea; rather, he claims the District Court failed to adequately consider the additional question of whether, though competent, he acted voluntarily, knowingly, and intelligently when he pled guilty. Additionally, Garner has not challenged the adequacy of the plea colloquy. *See McFarlane*, ¶ 17. Garner received a significant benefit from the plea agreement, which resulted in dismissal of three felony counts of sexual

intercourse without consent. *See Muhammad*, ¶ 14. Garner's motion to withdraw plea, although within the statutory period as previously noted, was filed nearly two years after his plea was entered. We have previously found that such a delay may weigh against the defendant. *McFarlane*, ¶ 19. In the present circumstances, however, the District Court "accord[ed] some weight" to the fact that Garner had raised the possibility of withdrawing his plea at the time of sentencing, and appeared to have "continuously contemplated" such action. Testimony at the evidentiary hearing indicated that a portion of the delay was attributable to Miller's efforts to secure outside counsel for Garner in order to avoid conflicts of interest. We agree with the District Court that "[c]onsidering the totality of the circumstances, this timeliness factor marginally weighs in Garner's favor."

¶29 Garner argues that due to his low verbal intelligence, as observed by the three doctors who evaluated him during the proceedings, his plea was not voluntary, knowing, and intelligent. We have stated that the defendant must be "fully aware" of the direct consequences of pleading guilty and must "understand" the rights and protections being waived. *Humphrey*, ¶ 22. But the record here does not support Garner's claim that he did not understand the consequences of entering a guilty plea.

¶30 Garner adequately demonstrated and affirmed his understanding of the proceedings at various points, for example, by informing the District Court during his change of plea that he understood aspects of the proceedings like jury selection. During his evaluation with Dr. Page, Garner understood and was able to describe the factual basis of the allegations against him as well as the terms of his plea agreement. At the

evidentiary hearing, Garner accurately remembered that his counsel had recommended a 10-year suspended sentence. Garner characterized this as a recommendation, and not a promise of any kind. He also remembered that the State had requested a 40-year sentence with 20 years suspended. He said that although he was initially confused about the net effect of that sentence, he understood it after his attorney explained it to him. On appeal, Garner claims he did not understand that he would be subject to a four-year mandatory minimum sentence, but he was informed of this during the initial appearance, the change of plea, and again at the sentencing hearing.

¶31 Garner claims he did not understand the consequences of his plea, because the District Court incorrectly informed him at the change of plea hearing that he would be required to serve 30 days of imprisonment. If the victim is under 16 years of age, the first 30 days of a sentence imposed for sexual intercourse without consent may not be suspended or deferred. Section 46-18-205(1), MCA. If the victim is under 16 years of age and the offender is three or more years older than the victim, the first two years of a sentence imposed for sexual assault may not be suspended or deferred unless a statutory exception applies. Section 46-18-205(2), MCA. Garner pled guilty to sexual assault, not sexual intercourse without consent; therefore, the first two years of his imprisonment could not be suspended unless otherwise provided. Section 46-18-205(2), MCA. The District Court mistakenly advised Garner that he would be required to serve 30 days.

¶32 Although Garner failed to object to the District Court's misstatement during the change of plea, did not raise the statements as an issue during the District Court's consideration of his motion to withdraw plea, and has repeatedly acknowledged that the

14

District Court's colloquy was adequate, he now claims the mistaken advisement supports his contention that he was confused about the consequences of his plea. Garner claims this confusion led him to erroneously believe there was a possibility that he could receive a fully suspended sentence. This belief was not, however, erroneous. As Garner correctly recalled at the evidentiary hearing, his attorney recommended a fully suspended 10-year sentence. Although the first two years of Garner's sentence could not ordinarily be suspended under § 46-18-205(2), MCA, the requirements of that section are subject to statutory exceptions listed at § 46-18-222, MCA. Thus, Garner could have received a fully suspended sentence based on his mental capacity at the time of the offense. Section 46-18-222(2), MCA. This argument was made by Garner's attorney at the time of sentencing. The record demonstrates that despite the District Court's mistaken reference to § 46-18-205(1), MCA, Garner accurately understood the sentencing possibilities.

¶33     Dr. Bach found that Garner, although "unbright," was not mentally retarded. At the evidentiary hearing, Garner was able to recollect his evaluation with Dr. Bach in detail, and to describe lucidly and accurately the medications he was taking. Neither Miller nor Stenerson was able to articulate any objective basis for concluding that Garner was incapable of understanding the change of plea, relying instead on "gut feeling." The District Court, having observed Garner's demeanor and testimony at the evidentiary hearing as well as throughout earlier proceedings, found credible the observation in the pre-sentence investigation report that Garner was capable of remembering and understanding more than he acknowledged, and sometimes claimed not to remember things that were not to his benefit.

¶34 Garner affirmed to the District Court during the change of plea that he understood the proceedings; that he was satisfied with the services of his attorneys, who explained to him anything he did not understand; that he understood his rights; that he believed entering a plea of guilty was in his best interests; and that he entered such a plea voluntarily. The record demonstrates that Garner understood the consequences of his decision to plead guilty, and his plea was not induced by any threats, misrepresentation, or improper promises. *See Warclub*, ¶ 32. Thus, we affirm the District Court's denial of Garner's motion to withdraw plea.

¶35 Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ JIM RICE